## Neeld's Estate

Before Van Dusen, P. J., Stearne, Sinkler, Klein, Bolger, and Ladner, JJ.

*James W. McLea* for John C. Bell, Jr., Secretary of Banking, exceptant.

*J. Edgar Wilkinson,* of *Shields, Clark, Brown & McCown,* for accountants.

LADNER, J., February 19, 1940.—This matter comes before the court on exceptions to the adjudication of the auditing judge.

At the audit the Secretary of Banking, as receiver of the Northern Central Trust Company, presented a claim on a note of $3,500 reduced by payments on account to $3,117.55, including interest to the date of the audit. On this note Charles W. Neeld, Jr., son of decedent, was the maker; he was also the payee. The note bears the endorsement first of Charles W. Neeld, Jr. (maker and payee), then of decedent, Mary R. Neeld, who was at that time a married woman living with her husband, who survives her. It was endorsed a second time under her name by Charles W. Neeld, Jr. The liability of such an endorser is fixed by section 64 of the Negotiable Instruments Law of May 16, 1901, P. L. 194, 56 PS §155, which provides:

"If the instrument is payable to the order of the maker or drawer, or is payable to bearer, he is liable to all parties subsequent to the maker or drawer."

Decedent was therefore prima facie liable to the bank which was the holder in due course. However, the executor called Charles W. Neeld, Jr. (maker and payee), who testified over objection, in substance that decedent, his mother, was only an accommodation endorser, that she

received none of the proceeds when this note was discounted by the bank, which were applied to his own use and not for her use. Accordingly it was ruled that the claim must be disallowed against the decedent's estate because of her disability: Harley v. Leonard et al., Execs., 4 Pa. Superior Ct. 431.

The Secretary of Banking, as receiver, by exceptions 1, 2, 3, 4 and 5 excepts to this ruling on the ground that error was committed by the auditing judge in allowing Charles W. Neeld, Jr., to testify.

It is, of course, apparent that Charles W. Neeld, Jr., although he may be one of the surviving parties to a contract of decedent, had no interest adverse to decedent's estate. He was the party ultimately liable, whether by direct action of the bank against him or indirectly if recovery were allowed against decedent's estate. As the party ultimately liable, his interest was such that he could neither gain nor lose by his testimony exonerating his mother's estate. See recent discussion of the cases in Groome's Estate, 35 D. & C. 535.

Counsel for the Secretary of Banking, as receiver, argues that Charles W. Neeld, Jr.'s testimony was incompetent, not necessarily because of any adverse interest but because he was a *surviving party* to the contract. This contention finds apparent support in the case of Farmers & Merchants Bank v. Donnelly, 247 Pa. 518, where a wife was the maker and her deceased husband the payee. The bank to which the note was endorsed sued the surviving wife. It was said:

"The Act of May 23, 1887, P. L. 158, Sec. 5, provides: 'Nor, where any party to a thing or contract in action is dead, or has been adjudged a lunatic and his right thereto and therein has passed, either by his own act or by the act of the law, to a party on the record who represents his interest in the subject in controversy, shall any surviving or remaining party to such thing or contract, or any person whose interest shall be adverse to the said right of such deceased . . . be a competent witness to

any matter occurring before the death of said party.' It is very evident that the defendant is a surviving party to the contracts in the present cases, and the rights of her deceased husband having passed by his own act to plaintiffs, she is, under the express terms of the statute, not a competent witness to testify to anything occurring before his death."

From this authority it is reasoned that the auditing judge erred in holding that Charles W. Neeld, Jr., was competent to testify under section 6 of the Act of May 23, 1887, P. L. 158, which permits "Any person . . . incompetent under clause (e) of section five, by reason of interest, may . . . be called to testify against his interest". The argument, as we understand it, is that the enabling provision is limited to persons incompetent *on account of interest* only, whereas the incompetence here rests on the fact of being a surviving party. The answer to this argument is that a surviving party is not incompetent unless his interest is adverse also. Such construction of section 5 of the act is not open to argument in view of the definite rulings of the Supreme Court to that effect in Edmundson's Estate, 259 Pa. 429, 436, Dickson et ux. v. McGraw Brothers, 151 Pa. 98, and First National Bank of Bloomsburg v. Gerli, 225 Pa. 256; and this despite the generality of the language of Farmers & Merchants Bank v. Donnelly, supra. We ought, perhaps, to point out that in the Donnelly case the wife was not only the surviving party but her interest was also adverse to that of her husband's estate, since she was the maker of the note and sought to avoid responsibility as such.

The auditing judge having properly ruled that Charles W. Neeld, Jr.'s testimony was admissible, exceptions 1, 2, 3, 4 and 5 are dismissed.

The Secretary of Banking, as receiver, also claimed the distributive share of Charles W. Neeld, Jr., pursuant to an attachment issued out of Court of Common Pleas No. 2 of Philadelphia County as of September term, 1936, no.

492, upon a judgment of $2,664.82 obtained against him on the same note.

The relevant facts as found by the learned auditing judge may be summarized as follows: Decedent died September 27, 1935. By her will she gave her husband $100 and the residue to her two sons, Charles W. Neeld, Jr. (defendant in the attachment), and Percy I. Neeld, and named them executors. On April 2, 1936, the will was lodged with the register of wills, together with an unsigned petition for probate in which the two sons were named as petitioners and executors. Thus the matter rested until August 10, 1936, when, at the instance of the Secretary of Banking, a citation was issued by the register against these two sons, to show cause why the will should not be probated.

In the meanwhile, Charles W. Neeld, Jr., from February 23, 1936, by letters, by personal interviews, and through counsel up until September 2, 1936, sought to compromise the claim on the note. On the date last mentioned his attorney delivered an ultimatum to the effect that, if Charles W. Neeld, Jr.'s offer of $400 in full settlement of the claim was not accepted, the will would not be probated and "Mr. Neeld would renounce his rights in the estate." The offer of compromise was refused.

On the same day (September 2, 1936), the register after a hearing ordered the two sons to complete probate within one week. On September 3rd, Charles W. Neeld, Jr., delivered to his brother, Percy, a written renunciation of legacy which, after reciting the bequest of one half of the residue, proceeded: "I, Charles W. Neeld, Jr., hereby waive, relinquish and renounce any gift, devise and bequest made by my deceased mother, unto me, under the above last will and testament, and direct that the provision given me thereunder shall revert to and be distributed in accordance with the provisions of the above will and in accordance with the law." Signed: "Charles W. Neeld, Jr."

On September 25, 1936, he further renounced his right to act as executor, and on the same day letters testamentary were issued to his brother, Percy, the remaining executor. On October 16, 1936, the Secretary of Banking obtained judgment; on October 28, 1936, the attachment claimed under at the audit was issued.

It was claimed at the audit that Charles W. Neeld, Jr., had accepted the legacy by his acts and conduct, and his renunciation thereafter was inoperative to affect his creditors. Moreover, the transaction was not in good faith and should be regarded as a fraud on creditors. The learned auditing judge, after a full and patient hearing of the testimony, came to the conclusion that the testimony of the acts and conduct did not warrant his finding that Charles, by implication, had accepted the legacy, and that the renunciation was in good faith.

Exceptions 6 to 15, inclusive, question the correctness of these findings as well as the ruling of the auditing judge dismissing the claim under the attachment. In the view we take of what we conceive to be the controlling principle of law, it is unnecessary to review the testimony upon which the learned auditing judge's findings rest. If we did so, we would go no further than to examine whether there was any adequate and competent evidence to support them: Hollins' Estate, 29 D. & C. 307.

It seems to us that the controlling question in this case is whether acceptance of a legacy is necessary before title passes to the legatee. If it is, then the dismissal of the claim must necessarily follow from the finding that the legacy was never accepted. On the other hand, if title to a legacy passes eo instanti at the death of the owner, then a refusal to accept, or a renunciation, is the equivalent of a release or a reassignment to the decedent's estate, or to those entitled to take under the will or under law.

If a legatee who renounces is solvent, the distinction (except so far as taxes are concerned) would be one without a difference. But where, as here, the legatee at the time of renunciation is presumably insolvent, then the

release is a "conveyance", being so defined by section 1 of our Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, and section 4 of that act would operate to void it as to creditors of the legatee.

Undoubtedly there are many expressions to be found in the decisions in this country as well as in the older English authorities, which indicate the view that title to a legacy cannot vest until there be first an acceptance, express or implied. Thus in 2 Sheppard's Touchstone (7 ed.) p. 452, it is said: "If one devise . . . doth refuse and wave the estate devised to him; in this case, and by this means, the devise . . . become void." And in 3 Preston on Abstracts of Title 104*, it is said:

". . . no estate can be vested in a person against his will; consequently no one can become a grantee, lessee, &c., without his *agreement*. The law implies agreement, till the contrary be shown; but the moment it can be shown that the party refused to accept the deed, or the estate, his disagreement will render the conveyance, grant, &c., inoperative."

Much of the difficulty in the earlier authorities undoubtedly arose from a failure to distinguish between the necessity of an "acceptance" to complete the act of delivery of a deed from a living grantor to a living grantee, and cases in which title passes at the death of the former owner to those entitled either under the intestate laws or by his will. The broad doctrine expounded by these authorities was even in England not without challenge, as, e. g., the learned dissent of Justice Ventris in Thompson v. Leach, 86 Eng. Rep. 391, 392, who pointed out the incongruity of a doctrine which leaves the title suspended in the air, so to speak, or else continues in him who has completely executed a conveyance of it. In that dissent, the ill effect of such a doctrine upon a stranger's rights was also commented upon.

That similar confusion exists in this country is shown by the various decisions as gathered under the general

principle set forth in 69 C. J. 974, and those cited by the learned auditing judge in his adjudication.

In our own jurisdiction, however, a more modern and realistic doctrine prevails, which is well stated by the learned Judge Gest in Paul's Estate, 1 D. & C. 231, 232:

"So long as the owner lives, he retains the ownership of the property, but his ownership ceases at his death, and it is his death that effects the transfer to another. If he dies intestate, the ownership is transferred to his heirs or next of kin as designated by law, but if he leaves a will, the testator himself designates the persons who take. But in either case, and in every case, the transfer of the property is due to the death of the owner and occurs at that time. This is the essential thing. The property, either real or personal, may indeed be taken for debts or may be subject to marshaling, but these administrative details are, in the language of logic, accidents, and do not concern or affect the essence of the matter. When, therefore, Mrs. Paul died, *eo instanti*, the property that she had previously owned was transferred to the persons whom she designated in her will, and it is this transfer that is taxed by the act of assembly: Lines's Estate, 155 Pa. 378; Small's Estate, 11 Pa. C. C. Reps. 1. That the legacy vested in N. McLean Seabrease immediately on Mrs. Paul's death is, of course, obvious. Had he died during the next hour, his personal representative would have been entitled, and his creditors, at any time before he renounced it, could have attached his interest, even if he had been ignorant of the legacy: Tarr v. Robinson, 158 Pa. 60; Heilig v. Heilig, 28 Pa. Superior Ct. 396."

That this statement of the law by Judge Gest is entirely accurate is plain from the support that it finds in the expressions of the appellate court decisions, notably Tarr et al. v. Robinson et al., 158 Pa. 60, 62, in which Mr. Chief Justice Sterrett, at page 62, commenced his opinion with the significant words:

"It is now too well settled to admit of question that, upon the ground of implied benefit, the assent of a donee

will be presumed; and the title will vest eo instanti the gift is made, even though he be ignorant of the transaction, and will continue in him until he rejects it".

And in Wonsetler v. Wonsetler, 23 Pa. Superior Ct. 321, at page 325, where it is said: "While the bequest vested the title in him, his refusal to accept would leave it part of the testator's residuary estate."

Thus viewed it is seen that a renunciation is in reality a release or in legal effect an assignment back to the estate of the decedent of the gift made by the legacy. This being so, any consequences which arise from the transfer of title from the decedent to the legatee cannot be ignored. One of these consequences is that the Commonwealth's transfer inheritance tax attaches and becomes payable: Paul's Estate, supra; Lefevre's Estate, 9 D. & C. 654; Fry's Estate, 14 D. & C. 577.

Another consequence which necessarily follows is that, while a solvent legatee may freely renounce and refuse the gift or legacy, yet if he is insolvent his freedom to do so is gone. The rights of his creditors come into play. Section 4 of the Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, strikes down the release and voids it as to creditors, if the release or transfer operates to render the legatee insolvent. In the words of the statute, "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." Section 1 defines the word "conveyance" to include every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property and also the creation of any lien or incumbrance. A release by a beneficiary of an interest in a trust estate was expressly held to be a conveyance within the meaning of this act: Schaefer v. Fisher et al., 137 Misc. 420, 242 N. Y. Supp. 308. Nor is the case before us different in principle from Buckius' Estate, 4 Dist. R. 775, 17 Pa. C. C. 270, where

this court held that a legatee could not renounce his legacy after attachment any more than he could assign it. The only difference between that case and this is that there the renunciation was arrested by the attachment, here by the Uniform Fraudulent Conveyance Act of 1921. In Farmers Trust Company of Lancaster v. Bevis et ux., 331 Pa. 89, it is held, prima facie, any voluntary conveyance by one in debt is fraudulent as to creditors. To sustain the transfer it is incumbent upon the grantee to prove the solvency of the grantor.

Since the question of the applicability of the Uniform Fraudulent Conveyance Act of 1921 was not raised before the learned auditing judge, no testimony was taken respecting the solvency or insolvency of Charles W. Neeld, Jr., as of the time the renunciation was signed and delivered. We feel that an opportunity should be afforded to him or his brother, Percy, to show such solvency if it existed. If, however, insolvency at the time of the renunciation is conceded, reference back to the auditing judge will be unnecessary. In the circumstances we make the following order:

Exceptions 7, 8, 9, 10, 11, 12, 13 and 14 are dismissed; exceptions 6 and 15 are sustained. If within 10 days from the filing of this opinion application is made to the auditing judge for a rehearing on the question of solvency of Charles W. Neeld, Jr., at the time of the renunciation, then the record will be referred back to the auditing judge to proceed in accordance with this opinion. Should such application not be made, then the adjudication is modified by awarding one third of the residue of the two thirds awarded to Percy I. Neeld, subject to the attachment of the Secretary of Banking. As thus modified, the adjudication will then be confirmed absolutely.

Judge Bolger dissents.

### Opinion on reargument

PER CURIAM, June 28, 1940.—On April 19, 1940, pursuant to petition of Percy Neeld, averring in substance

that exceptions had been sustained by the court en banc because of the operation and applicability of the Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, a point not considered by nor argued by his counsel, a reargument was ordered on that point.

Reargument was had at the May argument list and briefs submitted. We have carefully reconsidered the question in the light of the briefs submitted but find no error in our previous decision nor in the views expressed in our opinion. The disposition of the exceptions we there made is now reaffirmed.

Judge Bolger dissents.